Good morning judges. May it please the court. My name is Matthew Clayson. I represent Wayne Charles and Ford Self Storage in this appeal. Meredith Azarami is here with us in the courtroom today. Wayne Charles recently had back surgery and is unable to be present. This matter is another chapter in the ongoing saga of signage in the City of Los Angeles. This case, however, is unlike anything this court has previously heard. Most, if not all, of the recent cases heard by this court, such as Worldwide Rush, Metro Lights, and Vanguard, dealt with constitutional challenges to the City's sign regulations. Here, my clients do not challenge the propriety of the City's sign regulations. Quite the contrary, they seek to live within the law. The City Council has seen fit to allow temporary signs of a certain area, location, and material for no more than 30 days. The sign proposed by my clients meets all of these requirements. Thus, unlike prior cases, we're not dealing with a situation where a company is attempting to use the First Amendment as a means to trump the will of the City Council. My client's gripe with the City is not legislative in nature. It's that the enforcement officials will not allow them to post their proposed sign in accordance with the regulations. The case-defining question here is whether the sign is commercial or non-commercial. When you look at the sign, it surely looks commercial, doesn't it? Well, you've got to look at the subject matter of the sign, Judge. There's not much to look at. It says E-News, and there's a picture of Ryan Seacrest and his partner. I forget her name. E-News is a television program. That's all it is, is just a picture. Under decades of precedent, television programming is fully protected non-commercial speech. What's programming about this? What's the programming message about on this sign? Well, it's promoting the programming that occurs on the E-News. But isn't that classic advertising? Well, it is advertising, Judge. We can see that. So what's non-commercial about that? Well, it's advertising and non-commercial conduct. And the cases we've cited, many in our brief, recognize that when the underlying subject matter of an advertisement is non-commercial, the advertisement is also non-commercial. The key is to look at Bolger v. Young's drug product. That's the seminal case on distinguishing between commercial and non-commercial speech. There, the Supreme Court considered whether an advertisement for contraceptives that also contained family planning advice was commercial or non-commercial. That's what's missing here. There is no plus. It's raw commercial content. Well, Justice Marshall recognized that in this situation, a different result would arise. He said if the promotional material was for an activity that itself is protected by the First Amendment, such as a newspaper or a religious pamphlet, that a different result would occur. He didn't say would. He said you're reading from his footnote. Correct. He said it, well, he said it may. We don't deal with that particular situation. Right. He said it may. And the courts that have interpreted that language subsequently have said that if you have an underlying non-commercial work, such as a film, a book, a magazine, you look at the advertisement and you look to determine, is this an accurate depiction of the work itself? Okay? And that's what we have here. And I think that the error in classifying the sign as commercial stems from the failure to grasp the distinction between what the underlying subject matter of the sign is. We're not dealing with a commercial product here, like is it a shoe, an airline. It's not conveying any substantive message at all. It is. It's depicting. I mean, it's not telling us, you know, here are the latest about, you know, the current movie star that's in fashion or something. It doesn't tell us anything. If you look at some of the advertisements that were issued in those other cases, they're very similar to this. We have an advertisement in one of the cases for Boys in the Hood, the film. It had Boys in the Hood, the logo. It had a couple of actors from the film on it. That was deemed a non-commercial advertisement because the underlying work was non-commercial. What's the name of that case? That's the Lewis case. And then in the Reisig case, another case. And what was the context of the Lewis case? The Lewis case, I believe, was a negligence case to see if someone was exempt, if the movie poster itself was protected First Amendment conduct. Yeah, but it wasn't in the challenging the sign regulation, was it? That's correct. But we think that the context of the cases which decided that advertisements were non-commercial expressive works were also that they were also protected as inconsequential. There's many different cases. It's a state law case. Is that a state case, state of California case? It is, Judge. It is. So whether it's protecting an individual's name and likeness, overcoming a false advertising claim, defending against a negligence claim, all these cases have the same issue in common. Is the advertisement commercial or non-commercial? There is no indication in the law that if an advertisement is non-commercial in one context, it's commercial in another context. Do you think the Lewis case is your strongest case? Actually, I think the Reisig case is our strongest case. That case actually found that the advertisement was commercial because it was not an accurate depiction of the underlying film. How are you spelling that? Reisig, R-E-I-S-I-G. Okay. That's cited in our brief and our reply throughout. Okay. What the district court did, and I think what Justice Marshall forecasted against in his footnote, is that you can't just blindly apply the Bolger test. It just doesn't work. Take, for instance, one of the Supreme Court's seminal cases on the protection of non-commercial speech is the 1943 decision of Murdoch v. Pennsylvania. In that case, the court found that advertisements for religious books were fully protected. Now, had the court formulaically applied Bolger, it would have found just the opposite. The advertisements were advertisements. They referenced a specific product, religious pamphlets, and there was economic motivation. They wanted to sell more religious books. Nonetheless, because they promoted an expressive work, the court found that they were fully protected. So, counsel, I'm at the Reisig case. That's another California case. So tell me the language in Reisig that you contend dictates an outcome in your favor in this case. Reisig, it found that the advertisement that was issued in that case was commercial because it was false. It was not true. It was not an accurate depiction of the underlying work. However, the court said if the advertisement had merely depicted photographs of the actors in the film and not contained falsisms, then it would have been protected non-commercial speech. And there's other cases, too, judges, a few out of the lower courts in New York, the District Court of New York. This court's, if you go back to 1982, the Scher decision, it was a right of publicity case, but it found that if an advertisement is an accurate adjunct to an underlying non-commercial work, it is also non-commercial. That case, similar to Reisig, they found it was not, it was commercial because it was false. Again, not true. Nothing in the advertisement. So point me to the particular language in the Reisig case that you think overcomes the city's ability to enforce its signed ordinance. You can do it on rebuttal if you don't have it right at your fingertips. Okay, yeah, I'll do that, Your Honor. Here, the e-news sign promotes and depicts the protected e-news programming and goes well beyond merely proposing a commercial transaction. Now, going back to the point that you made, Judge. But it does, in a way, provide, propose a commercial transaction. It's as, it's as, if we're talking about, is We're asking, they're asking the viewer to watch e-news. Correct. Which is, in a sense, a commercial. Indirect. Indirectly, it is. We're also encouraging them to watch e-news. Because there's a benefit to e-news. Certainly. If we all watch e-news, e-news's ratings are going to go up and e-news is going to be able to sell advertisements, you know, to advertisers at a higher price. That's correct. But the case law is very clear that just because a work is associated with profit and it generates profit does not mean it loses. Oh, I understand that. Non-commercial status. So, now you look at the photograph, okay, it has the logo, it has the host of e-news. Yeah. The news changes on a daily basis. The only constant of e-news and what makes it a unique expressive work is the personalities of the hosts. Those are the things that people go to. It makes it different from Entertainment Tonight or other news channels. That's what makes it a unique expressive work. This case might be a little different if there were one of those signs that contains the news at the bottom or something, so that you would have a running script of news events, things that are occurring. This case might be a little bit different. I don't think the result's any different, Judge, but we couldn't do that in this case because the city wouldn't allow that. They wouldn't allow the electronic portion at the bottom of the sign. We'd love to do it. You know, we're trying to live within the law here. I can see the city's point because that's distracting when people are driving. Certainly. Yeah. And here the city council has decided this is not distracting. This is not a traffic safety issue. It's not an aesthetic issue. This sign is allowed. What kind of signs? Do you have evidence in the record of what kind of signs the city has allowed to be put up on a temporary basis that it considers noncommercial? We haven't got there yet, Judge. The case was dismissed on a motion to dismiss. No discovery was taken. Well, do you – I mean – Are there other circumstances? Is this the only sign that's ever been presented to the city as a noncommercial sign? Well, the way that the regulations are set up, if a sign's noncommercial, you don't even have to go to the city. You can just post it. Right, on a temporary basis. Right. And it can be near the freeway or wherever. And we've never tried to do that because at the time that my client was intending to post this sign, the city was very aggressive in prosecuting. I'm just wondering, and maybe the city attorney can answer this for me, what kinds of signs are – is this in effect a complete prohibition on signs, even though it's worded as allowing temporary noncommercial signage? Perhaps they can, Judge. I will say that you drive around the city of Los Angeles and you often see political signs, election signs up. And I don't know for a fact whether those signs have a permit. But I would think that they do not, that they're probably posted under the temporary sign provision because they don't need a permit, as long as they're only up for 29 days. My client's desire is to post other signs similar in nature to this one. It might be an issue in the future. The district court was concerned that, look, if I make a decision this sign's noncommercial, every time someone wants to build a sign there's a case that's going to be right back in front of me asking the same thing. And I don't think that's true because 98 percent of the time it's an easy answer whether a sign's commercial or noncommercial. This falls in that close line of cases where it's not so easy. It's a difficult question because the underlying work is noncommercial. I'm going to go ahead and reserve the remaining time for rebuttal, unless the court has any more questions. Okay, go ahead. If it please your Court, I'm Kim Westhoff, Deputy City Attorney representing the appellee here in the City of Los Angeles. The appellants are asking this court to undo over 30 years of established billboard case law, including the case of Metro Media v. City of San Diego, where in the United States Supreme Court stated cities can impose a citywide ban on off-site. I didn't understand their challenge to be to the ordinance as a whole. This is a very limited aspect of the ordinance. That's correct, Your Honor. And as applied. That's correct. It is very limited. Why isn't this noncommercial? Why is it noncommercial? Yes. Why is it not noncommercial? It is because it is a commercial sign. Why? For the e-news program. As the appellants said in their reply brief, and I quote, where's my quote, the sign is intended to promote the show and nothing else. In your view, let me ask you this, what would qualify as noncommercial? According to our sign regulations, and we put it in the regulations, a political or ideological or other noncommercial sign would qualify as a temporary sign. Okay. Political, you know, vote Republican. Vote for Jerry Brown for governor. Right. That's political. Save the whales. What's an ideological example? Save the whales. Save the whales. Okay. All right. Just to pull out three examples. What's noncommercial then? Those would also be noncommercial signs. Give me something that is not, doesn't meet the first two, but that qualifies as noncommercial. Okay. The way our sign code defines noncommercial signs, we have off-site signage and commercial signage. We would define it as it would be something that's not, it's a little bit difficult, and it would be something other than what's defined as commercial. So first we define commercial, and it would be something that's not a commercial sign. Give us an example that doesn't fit into the other two express categories. Surely you've thought about this in preparation for this argument. Yeah. I think something that would be a little more difficult. What if that's just a picture of an orange? A picture of an orange? Yes. I think if you have, yeah, if you have a garden, if you have a picture of flowers and trees, that would be noncommercial as long as it's not on a nursery, if it's on the side of a daycare center. What if here in this particular advertisement they just had a big E with quote marks around the E? See, then that E with the exclamation point is an identifiable logo, like a Nike Swish or the Coca-Cola bottle or the Pepsi logo. It's something that's identifiable with a product. The E with the exclamation point is identifiable with the E channel. So what if we had a Bible up there? A Bible? Mm-hmm. That's ideological. Ideological. That's religious. Then you're getting into freedom of religion. So then nothing really qualifies as noncommercial in your view? So that was just a word in the ordinance. It really has no meaning. No, I don't want to say that. But it is possible to have ideological and philosophical, clearly the larger two categories of things that go up on temporary basis for 30 days or less. How about a picture? I think his name is the Reverend Osteen, who's very popular now. He has a promotion. I'm not sure. Joel Osteen. What's his name? Joel Osteen. Joel Osteen. Suppose he had just a picture of Joel Osteen up there. He's a motivational religious guy. Oh, okay. Well, you know, there could be a problem with that. If he's going to be making a personal appearance, you know, it could be read as advertising that he's appearing at the Hollywood Bowl on Easter Sunday. What's wrong with that? Well, then that's a commercial ad. Why is that commercial? It could be read as a commercial advertisement. Why? Why? Why, yeah. I mean, you go to the Hollywood Bowl to hear this fellow speak about his religious motivational approach. Yeah, what if it's free? Yes. If it's free, then arguably it would be non-commercial. But if tickets are being sold and ‑‑ Well, it's got to cover the cost of the Hollywood Bowl. I mean, you just don't show up at the Hollywood Bowl and give a motivational speech and have the county walk away with nothing. The incidents and the scenarios wherein profit has been made off of religious programming are replete. The times that people have said that they've been watching a religious program on TV and they were asked to send in money to support and then we found out that the money wasn't being spent strictly for the religious programming or strictly to support the ministries has been documented many, many times. And so you kind of have to be careful about that line between freedom of religion, supporting the religion, and the commercialization of it. It's really troubling that you can't think of one example where it would be non-commercial speech but not with traditional First Amendment implications. Yeah. The scenario before the court at this point in time and the scenario that was presented to the city of Los Angeles was the e-news billboard that was attached to the complaint. And that's what the city was asked to look at. What if there was ‑‑ what if every day they changed the sign to have news of the day on there? Would that be non-commercial? No, it would still be commercial. Why? Because what they're asking you to do is come and listen, come watch the program. They are more focused on the program. It's not ‑‑ they're not just saying Tom Cruise signed for a new movie. What they're saying is Tom Cruise signed for a new movie, watch the e-news program. But what if it's a combination of that? Because if you have a book and the book is about religion and you're selling it for a profit, but you're also enlightening people's spiritual life, would that be strictly commercial? Then what you're getting into is, is the message and the product inextricably intertwined, as in the Fox case and several other cases? Can you untwine the two? If you can untwine the two, then what you have is commercial speech. What they found in the Fox case was that the Tupperware parties and the speech about financial responsibility were not inextricably intertwined, much like in the Hunt case where they were saying on Dennis Borbach, I'm selling candles, I'm selling shea butter, but I'm also giving information. It was found that the two were not inextricably intertwined. That was on that panel. Yes, ma'am. And the two could be untwined and separated. And that's what I think your example is proposing, saying that Tom Cruise signed for a new movie and changing that message daily, whatever the news might be of the day, and putting that on an e-news sign is not inextricably intertwined with an advertisement to watch the e-news program with a picture of Ryan Seacrest and Juliana Rancic. It is not inextricably intertwined. They're very separable, as the example shows, because you're talking about changing the message every single day. So in the history of the sign ordinances in Los Angeles, has there ever been a sign approved that was deemed to be noncommercial, that was not one of the core First Amendment type of signs? If the sign, a temporary sign that is political, ideological, or noncommercial does not need a permit, it does not need to be approved. Okay, so the city, are there some in existence that the city has seen and has not challenged as being noncommercial? Because I know that you have people who police the highways to see if there are any infringing uses. So does the city have any record of any that have been brought to its attention and that the city has said, those are fine, let's not challenge their existence? I'm not aware of the city issuing citations or orders to comply for any temporary noncommercial signs. What do you think the Supreme Court meant in footnote 14 in Bolger where the court makes a statement, of course a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment. I think there they were dealing with the Jehovah's Witnesses pamphlet soliciting money for, I think it was for religious pamphlets. Correct. I think there they're probably getting into the, a little bit more into the inextricably intertwined portion of it, where there's, plus freedom of religion. You know, where the two are, where it's. Well, it just says, of course, a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment. Now, their argument here is that the program, e-news, the program is protected First Amendment activity. There's a different. You couldn't go, the city couldn't attempt to regulate the program itself, correct? No, no. And no one is suggesting that the city is trying to regulate the program. Right. The First Amendment is a very, very broad category where you can have, you can go from live nude dancing to children's programming on Sesame Street. Then underneath that, there's several categories. The city is empowered constitutionally to regulate commercial speech on billboards. Case law has established that. It has established that, and there's no question about that. We're dealing allegedly with non-commercial speech. But this is clearly, and common sense tells us, that this is commercial speech, and it meets the three-part Bolger test. Appellant is asking you to throw out the Bolger test. Some of the cases that Appellant has cited predate Bolger, predate Central Hudson, and deal not just with commercial speech, but deal with other types of speech. Metro, Worldwide Rush cited Metro Media, which talked about there are many types of ways of communicating. In this particular area, we deal with the law of billboards. And I think you have to compare apples with apples. This is a billboard case. This is a sign case. And you have to apply sign and billboard cases. Talking about cases with right of publicity is comparing something that has nothing to do with what is currently before the Court. Talking about cases where, with right of publicity between Cher and, you know, movies and things like that, those are in large part very, very different from billboard cases, and very distinguishable on that basis alone. So what if the pamphlet in Bolger was just the advertisement here, commercial, non-commercial? Well. Asking for money. Yeah. Well, you're also talking about public debate. Well, I'm just asking you. Yeah. I just kind of want to know what's non-commercial. I guess nothing is really non-commercial. It's non-commercial. I mean. In your view, it has to either be political, pure political speech, classic political speech, or. Ideological. You said ideological. Something like save the wells. What if it was the Mona Lisa? I'm sorry. What if it was the Mona Lisa? Then, yeah. See, then you're. And how's it being used? It's just a picture. I mean, I think it's not that hard of a question. Okay. What's non-commercial? Art. Well, but see, if you put up a still from an old, old movie, you know, a still from Casablanca, that movie is available for purchase these days. So that would be, in your view, commercial speech as well? It could very easily be deemed commercial speech, because even if you don't say internet, or you can go to a movie store and buy it, or you can buy merchandise with it, the same thing. I would think that's very overbroad in the city's definition. However, what. That is not. That is also not the question before the court right now. The question is whether this particular sign is commercial. The ruling we make will not just apply to this particular sign. It will apply generally. And so that's why we're trying to get an idea of how far the city's interpretation of the ordinance ranges. And it's extremely difficult to get a feel for where this ordinance goes. So on the 110, for example, we have big signs. Maybe that's in the L.A. live zone. The big signs with musicians from the Philharmonic. Right. When you're at the L.A. live zone, though, you are dealing with areas where what is permissible signage is different, because it's also. I know that. I wrote that opinion. Correct. I know that. But what I'm saying is, suppose you had a portrait of a musician where this sign is. Commercial or non-commercial? If it's nondescript, I think it would be non-commercial. Just a musician. Just kind of promoting the arts or something? Just promoting the arts. If you're just straight promoting the arts, that would be ideological. So just a picture of Celine Dion. Celine Dion? Yeah. I think then you're looking at commercial, because she has music and records and movies and television shows and CDs and things. But why wouldn't that be promoting the art? I don't think the city has a definition of non-commercial. I don't think that's the problem here. I don't think you really actually have in mind a definition of non-commercial. Perhaps the city should think about that. Okay. When you have somebody who has commercial product available for sale. It's like you know it when you see it. Very much so. Very much so. It is in many ways. And that's why you have so many cases that talk about common sense. My daughter's AP history test. It did the Supreme Court ever set forth a clear definition of obscenity. It comes up a lot in the AP history review. Yeah. And we have several cases that talk about it. You literally use the word common sense when you look at it and you can tell it's commercial speech. But it's difficult for people who are trying to comply with the ordinance to determine what they can and can't do if the ordinance is not clear in terms of what's prohibited and what's not prohibited. But when you look at but the city also must follow case law and when you have the Bolger test, three-part Bolger test, which tells you that when you're looking at advertising formats, reference to a specific product and economic motive of the speaker, then you have something to measure it by. That's also not a very good test. But anyway, you're over your time. So thank you. And I think you had time left. Very briefly, Judge Rawlinson, getting back to the Reza case, I've got that site there. Okay. Tell me a page. It's 116 Calab 4th, 142 is the page. 142. I'll read you the quote here. It says, had the advertisements been merely adjuncts to the exhibition of the films, such as by using photographs of actors in the films, Sony would have a point because just as the films are noncommercial speech, so is an advertisement reflecting their content. So I think that clearly establishes that if an underlying work is noncommercial and the advertisement is an adjunct of that noncommercial speech, it is also noncommercial. Now, Judge Paez, you suggested a sign. What if the sign just said E, nothing else? To me, that's a commercial sign. That's not reflecting any programming. That's reflecting a business. E News, on the other hand, is a specific program that is an underlying work of expression. What if we took E News off and just had the pictures of the actors? Would that be Resnick? Pardon me? Would that be your case that you cited? It would be. Rezick or Resnick? I think Rezick would apply to both situations, but I, too, think that would be noncommercial as well. These two folks together are on E News. As far as I know, they're not dating or they're not on any other show together, so I think that would just be another promotion for E News, and I think the result would be the same. You also mentioned a sign. What if it was a picture of a Bible? Obviously noncommercial. If it said Bible for sale, in our opinion, that is also noncommercial because, again, Bible, the underlying work, is noncommercial. The sign would be noncommercial as well. The fact that it's sold for a profit, according to the precedent, doesn't matter. The difficulty with your argument, with you relying on Rezick, is that the court did not make a ruling that just said you have a point. Well, there's, I mean, Judge, there's at least 10 other cases we cited in our brief. But I asked you for your best case, and you said this was your strongest case. I think that the language in that case is just so clearly on point for us. You might be right. It might be dicta because it was not exactly at issue in that case. But the fact that they went that far and they cited some other decisions, Guglielmi, Polydorus, which are decisions we cited in our brief as well for that position, that that position exists. Basically what the city says is you're saying come watch our program, and that's right. That's exactly what the sign is saying, come watch the program. Because what's the point of having a noncommercial work, expressive work, if no one can see it? That point was made in the Polydorus decision where the court said, having established that any interest in financial gain in producing the film did not affect the constitutional stature of respondents' undertaking, it is of no moment that the advertisements may have increased the profitability of the film. It would be illogical to allow respondents to exhibit the film but effectively preclude any advanced discussion or promotion of their lawful enterprise. So that case also supports the fact that the advertisement is noncommercial. The city suggested we're trying to throw out the Bolger test. That's not what we're trying to do. Our position is the Bolger test doesn't formulaically apply in all situations. I think, Judge, you had it right. It's not a very good test. Justice Marshall said not all elements have to be present, maybe one element's present. It's not a very good test, and it doesn't apply in this case. Thank you. All right. Thank you very much, counsel. Charles V. Los Angeles will be submitted.
judges: Wardlaw, Paez, Rawlinson